IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MARTA BETANCOURT ESQUERDO, et
al.,

Plaintiffs

v.                                                    CIVIL 03-1189 (PG)

UNIÓN INTERNACIONAL UNITED
AUTO WORKERS,

Defendant

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the court on motion for summary judgment filed by
defendant Unión Internacional United Auto Workers (hereinafter "UAW") on
April 14, 2005.  (Docket No. 63.)  A corrected brief in support of the motion for
summary judgment was later filed on June 6, 2005.  (Docket No. 78.)  The case was
referred to me for a report and recommendation on April 26, 2005.  (Docket No.
70.)  The plaintiffs, Marta Gisela Betancourt Esquerdo (hereinafter "Betancourt")
and Ernesto Ramírez (collectively "plaintiffs"), filed an opposition on July 6, 2005.
(Docket No. 85.)

Plaintiffs' amended complaint, filed April 25, 2003, alleges eight causes of
action.  The first through fourth causes of action seek damages for alleged violations
of Title VII, 42 U.S.C. § 2000e et. seq. (hereinafter "Title VII").  The fifth cause of
action alleges violations of the Consolidated Omnibus Budget Reconciliation Act, 29

CIVIL 03-1189 (PG)                          2

U.S.C. § 1661 et. seq. (hereinafter "COBRA")[1].  The sixth cause of action is a supplemental claim based on the statutes and Constitution of Puerto Rico.  The seventh cause of action is a claim for loss of consortium.  The final cause of action seeks wage loss damages in reference to the first four causes of action.  UAW's motion for summary judgment is directed towards all eight causes of action.

Having considered the arguments of the parties, the evidence in the record, and the applicable law, it is my recommendation that defendant's motion for summary judgement be DENIED in its entirety.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The following facts are stated in a light most favorable to the plaintiff.  On November 2, 1998, plaintiff Betancourt applied for employment with defendant UAW in its Carolina, Puerto Rico office.  Interviewed by Robert Madore and Fernando Juarbe, plaintiff was hired on January 25, 1999 as a "call-in employee."[2] Approximately six months later, on July 7, 1999, Betancourt's employment became

---

[1]In plaintiff's opposition to UAW's motion for summary judgment, plaintiff moved for summary judgment with regard to her COBRA claim. (Docket No. 85.) It is considered separately.

[2]Article 2, section 2, of the terms and conditions of Betancourt's employment defines "call-in employees" as employees who are hired for a short-term period not to exceed six months, such as for vacation, sick time, personal leave, etc.  Once a call-in employee has completed six months of employment within a 12-month period, their status will be changed to that of a temporary full-time employee.  During the first six months of employment, temporary call-in employees do not have Union representation, nor do they have any benefits under the Collective Bargaining Agreement.  The UAW does not rotate different call-in employees through a position or positions in order to avoid the transition from call-in to temporary full-time.

CIVIL 03-1189 (PG)                    3

classified as "Temporary, Full-Time Clerk-Typist."[3]  There is a factual dispute as to what the plaintiff's duties were, but the plaintiff has provided evidence indicating that her responsibilities included general clerical work, was not dependant on the amount of temporary organizers employed by the Carolina office, and was not limited to administrative work resulting from the Carolina office's responsibility for organizing drives.

Robert Garvin (hereinafter "Garvin"), is a UAW representative within the Technical Office and Professional, and handled grievance procedures within the UAW.  Phil Wheeler (hereinafter "Wheeler") is the Regional Director of Region 9A of the UAW, which oversees offices in the United States and Puerto Rico.  Robert Madore (hereinafter "Madore") is the Assistant Director of Region 9A of the UAW. The offices of Wheeler and Madore are located in Connecticut.  At all relevant times, the UAW representatives present in the Carolina office included Abigail Ortiz (hereinafter "Ortiz"), Fernando Juarbe (hereinafter "Juarbe"), and Lida Orta-Anes (hereinafter "Orta").  The clerical workers in the office included Racquel Heywood

_____

[3]Article 2, section 2, defines "temporary full-time employees" as employees who are (i) replacing another regular employee on leave or (ii) are hired because of circumstances that require temporary help for an indefinite period and shall be entitled to the benefits of a permanent employee in accordance with their seniority. If the employee's status is changed from temporary full-time to permanent, the employee's seniority date will revert to her/his latest date of hire.  If a temporary full-time employee is laid-off, she/he will not be entitled to any contractual benefit while laid-off.  Temporary full-time employees may be considered for permanent positions that the UAW intends to fill within their region, sub-region, or the Detroit area, whichever applies.

CIVIL 03-1189 (PG)                              4

(hereinafter "Heywood"), Carmen Cartagena (hereinafter "Cartagena"), Raquel Martínez (hereinafter "Martínez"), Maritza Rivera (hereinafter "Rivera"), and Miriam Martínez Gonzales (hereinafter "Gonzales"). There is a factual dispute over who had supervisory authority over the plaintiff. UAW argues that Juarbe, Ortiz, and Orta were simply coworkers and did not have supervisory authority over Betancourt, while Betancourt argues to the contrary that they each had some form of supervisory authority over her and the clericals.

Plaintiff alleges that sexual harassment, on which her complaint is based, began in May, 2000. Plaintiff alleges that Juarbe singled her out, hugging and kissing her in a salacious and derogatory manner. Plaintiff objected to such behavior through her body language, and by saying "that's enough!" Despite plaintiff's negative body language and response, this hugging and kissing by Juarbe became a daily and continuous behavior that lasted for months. Plaintiff alleges that this behavior occurred in the morning, whenever he left the office, and when he left work for home. And when she began to distance herself from Juarbe, Juarbe always found ways to sneak up on the plaintiff and surprise her.

Additionally, plaintiff alleges an instance where she pulled her chair away from Juarbe after he rubbed his knee on her thigh, only to have her chair pulled back by him after she rebuked his advances. Juarbe also continually said to plaintiff, "if you are going to misbehave, invite me." Plaintiff Betancourt has provided this court with a number of documents suggesting such comment to have

CIVIL 03-1189 (PG)                          5

sexually charged innuendo.  Plaintiff alleges that this comment was directed solely at her, and no one else.  After rebuking Juarbe, plaintiff Betancourt alleges that Juarbe and Madore engaged in a campaign of emotional harassment and work sabotage.

As a result of such behavior, plaintiff verbally complained to Ortiz on September 19, 2000.  There is a factual dispute whether or not Ortiz was the proper channel to report such sexual harassment to per the UAW's sexual harassment policy.  Nevertheless, an official administrative grievance # 08-01 was filed on August 20, 2001. On September 12, 2001, a copy of this grievance was faxed to Garvin. After Madore received this inter-office grievance, plaintiff Betancourt alleges that Madore became increasingly hostile towards her, at one point almost hitting Betancourt on the breast with a pen.  In addition, shortly before the investigation of plaintiff's grievance began, plaintiff's office area was vandalized with drawings of male genitalia.

On November 19, 2001, plaintiff met with UAW officials to discuss her internal complaint. Three hours later, plaintiff Betancourt was discharged from her employment.  UAW claims that the discharge was due to "Reduction of the Temporary Organizing Staff." Betancourt, on the other hand, alleges that her lay-off was retaliation for the sexual harassment grievance she had filed.

A complaint was subsequently filed by Betancourt, and UAW now moves for summary judgment claiming that there is no genuine controversy as to any material

CIVIL 03-1189 (PG)                    6

fact precluding the entry of judgment in its favor.   Betancourt opposes UAW's request.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  To succeed on a motion for summary judgment, the moving party must show that there is an absence of evidence to support the nonmoving party's position. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to set forth specific facts showing there is a genuine issue for trial and that a trier of fact could reasonably find in its favor. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The party opposing summary judgment must produce "specific facts, in suitable evidentiary form," to counter the evidence presented by the movant.  López-Carrasquillo v. Rubianes, 230 F.3d 409, 413 (1st Cir. 2000) (quoting Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 748 (1st Cir. 1994)).  A party cannot discharge said burden by relying upon "conclusory allegations, improbable inferences, and unsupported speculation." Id.; see also Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002) (quoting J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir. 1993)) ("[N]either conclusory

CIVIL 03-1189 (PG)                            7

allegations [nor] improbable inferences' are sufficient to defeat summary judgment.").

The court must view the facts in the light most hospitable to the nonmoving party, drawing all reasonable inference in that party's favor.  See Patterson v. Patterson, 306 F.3d 1156, 1157 (1st Cir. 2002).  A fact is considered material if it has the potential to affect the outcome of the case under applicable law.  Nereida-González v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

Additionally, Local Rule 56 requires that the moving party seeking summary judgment  provide the court with a list of uncontested facts on which it relies, and that the non-moving party include a "a separate, short, and concise statement of the material facts...."  "This 'anti-ferret' rule aims to make the parties organize the evidence rather than leaving the burden upon the district judge."  Alsina-Ortiz v. LaBoy, 400 F.3d 77, 80 (1st Cir. 2005). "[When] the party opposing summary judgment fails to comply, the rule permits the district court to treat the moving party's statement of facts as uncontested."  Id. (citing Cosme-Rosado v. Serrano-Rodríguez, 360 F.3d 42, 46 (1st Cir. 2004)).  Additionally, the non-moving party cannot simply "dispense with the requirements of the rule by stating general objections to defendant's proposed facts."  García Sánchez v. Román Abreu, 270 F. Supp. 2d 255, 259 (D.P.R. 2003).  However, summary judgment is precluded if the non-moving party submits a statement of contested facts that create genuine issues of material fact.  See id.  Thus, in order to determine whether or not the non-moving

CIVIL 03-1189 (PG)                              8

party has complied with Local Rule 56, one must first look at the moving party's statement of facts with regard to the issue, and then look at the non-moving party's statement of contested facts to see if she has controverted those particular facts. Compliance with this rule precludes summary judgment.

### III.  DISCUSSION

A.  Title VII Claim:  Hostile Work Environment

Title VII prohibits discrimination against "any individual ... with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...."  42 U.S.C. § 2000e-2(a)(1).  Sexual harassment is unquestionably a form of discrimination prohibited by Title VII.  <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 64 (1986).  EEOC regulations define what constitutes sexual harassment in the Title VII context.

> Harassment on the basis of sex is a violation of Sec. 703 of Title VII.  Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a) (footnote omitted).  Specifically, a sexual harassment claim may be brought under two separate theories:  quid pro quo and hostile work

CIVIL 03-1189 (PG)                              9

environment.  See Rodríguez-Hernández v. Miranda-Vélez, 132 F.3d 848, 854 (1st

Cir. 1998).

        A hostile work environment is created when an employer requires an

employee "to work in a discriminatorily hostile or abusive environment." Crowley

v. L.L. Bean, Inc., 303 F.3d 387, 394 (1st Cir. 2002) (quoting Harris v. Forklift Sys.,

Inc., 510 U.S. 17, 21 (1993)).  "A hostile work environment exists in violation of

Title VII '[w]hen the workplace is permeated with discriminatory intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment.'"  Kosereis

v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003) (quoting Harris v. Forklift Sys.,

Inc., 510 U.S. at 21).  Since there is no "mathematically precise test" to determine

whether enough evidence has been presented for a hostile environment claim,

Harris v. Forklift Sys., Inc., 510 U.S. at 22, the court must look at all the

circumstances, including the frequency of the discriminatory conduct; its severity;

whether it was physically threatening, or humiliating; and whether it unreasonably

interfered with plaintiff's work performance.  Nat'l R.R. Passenger Corp. v. Morgan,

536 U.S. 101, 116 (2002).

        For a hostile work environment claim to be actionable under Title VII, the

"sexually objectionable environment must be both objectively and subjectively

offensive, one that a reasonable person would find hostile or abusive, and one that

the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S.

CIVIL 03-1189 (PG)                    10

775, 787 (1998).  A mere offensive utterance is not enough to create a hostile

environment.  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. at 21.  Similarly, simple teasing,

offhand comments and isolated incidents will not amount to a change in the terms

and conditions of employment.  <u>Faragher v. City of Boca Raton</u>, 524 U.S. at 788

(internal quotations omitted).  Thus, to succeed in a hostile work environment

claim, a plaintiff must prove the following:

> (1) that she (or he) is a member of a protected class; (2)
> that she was subjected to unwelcome sexual harassment;
> (3) that the harassment was based upon sex; (4) that the
> harassment was sufficiently severe or pervasive so as to
> alter the conditions of plaintiff's employment and create an
> abusive work environment; (5) that sexually objectionable
> conduct was both objectively and subjectively offensive,
> such that a reasonable person would find it hostile or
> abusive and the victim in fact did perceive it to be so; and
> (6) that some basis for employer liability has been
> established.

<u>O'Rourke v. City of Providence</u>, 235 F.3d 713, 728 (1st Cir. 2001); <u>Noviello v. City</u>
<u>of Boston</u>, 398 F.3d 76, 95 (1st Cir. 2005).  Because the accumulated effects of

incidents over time can amount to a hostile work environment, the allegations of

harassment must be considered collectively.  <u>O'Rourke v. City of Providence</u>, 235

F.3d at 729.  In the present case, defendant UAW argues that plaintiff Betancourt's

claim fails because the undisputed evidence demonstrates that she cannot establish

elements two, three, four, five or six.

   1.  <u>Unwelcome Sexual Harassment</u>

CIVIL 03-1189 (PG)                    11

The correct inquiry as to whether or not "unwelcome sexual harassment" exists is whether the plaintiff, by her conduct, indicated that the alleged sexual advances were unwelcome. <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. at 58.  For instance, "a woman's consistent failure to respond to suggestive comments or gestures may be sufficient to communicate that the man's conduct is unwelcome." <u>Lipsett v. Univ. of Puerto Rico</u>, 864 F.2d 881, 898 (1st Cir. 1988).  "Whether [the] particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact...." <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. at 68.

Defendant UAW argues that plaintiff Betancourt was not subjected to "unwelcomed sexual harassment" as a matter of law because Betancourt admitted that hugs and kisses were customary within her office; she never explicitly told Juarbe that she did not welcome his kisses; she never asked Juarbe what he meant by the comment:  "if you are planning to misbehave, invite me"; that this comment was made by Juarbe to others in the office, including men; and when Betancourt finally complained about Juarbe's behavior to Ortiz, that this behavior had stopped. (Docket No. 78.)

UAW, however, has based its argument on facts in a light most hospitable to itself, and has failed to consider documentary evidence suggesting that Betancourt was subject to "unwelcome sexual harassment."  While it is undisputed that hugs and kisses are a customary practice among Puerto Ricans, such custom does not

CIVIL 03-1189 (PG)                    12

grant carte blanche for one to hug and kiss another without consent.  The fact that others consented to hugs and kisses within the office is not dispositive of Betancourt's lack of consent to be kissed by Juarbe.  Relying on Betancourt's admission that people in the office routinely hugged and kissed each other and that "an occasional kiss is no reason to get alarmed," UAW distorts the record by drawing pieces from the evidentiary record to paint a picture that is taken out of context. This court, however, is not dealing with "occasional kisses," nor is this court dealing with hugs and kisses among other people.  What the court is dealing with is the relationship between Betancourt and her alleged harassers.  Here, UAW argues that Betancourt never explicitly told Juarbe that she did not welcome his kisses. However, Betancourt testified that she told Juarbe "that's enough!," and used her body language to indicate her non-consent. (Docket No. 64, Brief in Support of Defendant's Motion for Summary Judgment, Betancourt's Dep. at 41, l. 24, at 42, l. 16.)  In compliance with Local Rule 56, Betancourt's testimony, referenced in her statement of uncontested facts, creates a genuine issue of material fact as to whether or not Betancourt, subjectively, did not welcome such behavior.

Additionally, UAW argues that Juarbe's comment "if you are planning to misbehave, invite me," could not be construed as sexual harassment in the first place because Betancourt never explicitly asked what the comment meant, and Juarbe made such comments freely.  However, several employees have testified that such a comment was not freely used, was not used in the office as a joke, and was

CIVIL 03-1189 (PG)                           13

said in a salacious manner.  (Docket No. 88, Plaintiffs' Opposing Statement of Material Facts, Ex. 8, ¶¶ 32-36; Ex. 9, ¶ 11; Ex. 10, ¶ 17; Ex. 11, ¶¶ 43-47; Ex. 12, ¶¶ 8-16.)  Moreover, Betancourt has complied with Local Rule 56 and provided evidence that such comments were unwelcome, including her own testimony that she told Juarbe that she did not misbehave, and that she was never going to invite him, and that she spent her time with her husband and daughter.  (Docket No. 88, Ex. 8, ¶ 35; Docket No. 64,  Betancourt's Dep. at 72, ll. 23-24.)

The question is whether or not Betancourt did not welcome the alleged sexual harassment by Juarbe.  Thus, whether there was "unwelcome sexual harassment" cannot be determined as a matter of law in UAW's favor because Betancourt has provided sufficient evidence demonstrating genuine issues of material fact with regard to this particular prong.

That Betancourt allowed Juarbe's behavior to continue for some time, before finally reporting it to the proper department head, is also not dispositive of this prong's requirement.  Title VII is not meant "to punish the victims of sexual harassment who surrender to unwelcome sexual encounters[,]" for "[s]uch a rule would only encourage harassers to increase their persistence."  Jin v. Metro. Life Ins. Co., 310 F.3d 84, 96 (2nd Cir. 2002) (citing Karibian v. Columbia Univ., 14 F.3d 773, 778 (2nd Cir. 1994)).

Because Betancourt's statement of uncontested facts has sufficiently provided evidence that creates genuine issues of material fact, she has complied with Local

CIVIL 03-1189 (PG)                    14

Rule 56 such that summary judgment with regard to this particular prong is precluded.

2. Harassment based upon Sex

In compliance with Local Rule 56, plaintiff has provided evidence that Juarbe's alleged discriminatory behavior was different with the male employees. For instance, Orta, a UAW representative who worked in plaintiff's office, testified that "[w]hile [Juarbe] reacted overtly aggressive towards the female staff, he was extremely non-confrontational with the male staff." (Docket No. 88, Ex. 8, ¶ 30.) Heywood, a clerical within the office, testified that she never witnessed Juarbe direct himself towards the male staff in the same disrespectful and offensive manner as he did towards the female clericals. (Docket No. 88, Ex. 10, ¶ 5.) Three workers in the Carolina office also testified that when Juarbe kissed Betancourt, he would put his arms around her neck and pull her towards him. No male employee had ever been subject to such behavior. UAW's statement of facts argues that such behavior could not be "based on sex" because everyone in the office was subjected to these comments. However, in compliance with Local Rule 56, Betancourt provided evidence that from Heywood, Orta, Gonzales, and Cartagena, who each testified that the comment "if you are going to misbehave, invite me" made by Juarbe was sexually charged, vulgar and offensive, and was never stated to male employees in the office.

UAW argues, by generalization, that such behavior was gender neutral, and was directed at all workers within the Carolina office, as well as anyone who stepped

CIVIL 03-1189 (PG)                    15

into their office.  However, plaintiff Betancourt has provided evidence, in compliance with Local Rule 56, suggesting that such behavior was directed at only female workers.  Additionally, plaintiff's statement of uncontested facts demonstrates that the comments and hugging and kissing directed at Betancourt were sexually charged.  Thus, if this court is to view the plaintiff's statement of uncontested facts in a light most favorable to the plaintiff, it is precluded from granting summary judgment, given that genuine issues of material fact exist with regard to this prong.  See E.E.O.C. v. Horizons Hotel Corp., d/b/a Carib Inn Hotel, 831 F. Supp. 10, 14 (D.P.R. 1993) (finding the "harassment based upon sex" prong satisfied given witness' testimony stating that defendant "usually treated women in the same sexually offensive manner he treated plaintiff").

### 3.  Abusive Work Environment

Ordinarily, the jury determines whether or not the alleged harassment was severe and pervasive enough to alter the conditions of a plaintiff's employment.  Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F. Supp. 2d 108, 112 (D.P.R. 2002) (citing Marrero v. Goya de P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002)).

UAW argues that Juarbe's conduct was not "sufficiently severe or pervasive so as to alter the conditions of Plaintiff's employment and create an abusive work environment." (Docket No. 78, at 13.)  Specifically, UAW argues that given that Betancourt failed to immediately file a complaint with her department head, failed to resign, and admitted that she would have continued to work at the office had she

CIVIL 03-1189 (PG)                        16

not been fired, Betancourt has failed to establish an "abusive working environment."

UAW points out that the alleged sexually charged comments and hugs and kisses

were commonplace within the office, and by virtue of being commonplace such

behavior could not have risen to the level of an "abusive working environment."

　　　UAW's arguments, however, do not dispose of the "abusive work environment"

prong of the hostile work environment test.  Betancourt's statement of uncontested

facts referenced testimonial evidence suggesting that Juarbe continually hugged and

kissed Betancourt salaciously, without her consent.   Heywood testified that

"[Juarbe's] kissing of [Betancourt] became a daily and continuos behavior.   In

[Heywood's] presence he kissed her in the morning when arriving at the office, if

he went out of the office he kissed her, and if he came back before the end of the day,

he kissed her again.  This went on for several months." (Docket NO. 88, Ex. 10, ¶

13.)  Heywood also testified that Juarbe kissed Betancourt by "putting his arm

around her neck, pulling her towards him and kissing her.  The behavior shown by

Juarbe was obviously sexually charged and objectively inappropriate." (Id. ¶ 14.)

Plaintiff Betancourt testified that Juarbe would often take her by surprise, putting

his arms on her shoulders while she was writing, and singling her out by

approaching the plaintiff as Juarbe arrived at work.   (Docket No. 64, Betancourt's

Dep. at 70, ll. 7-10.)  When Betancourt rebuked Juarbe's comments "to invite him

when she misbehaved," Juarbe escalated his emotional harassment and work

sabotage.  Betancourt testified that Juarbe changed her work schedule, gave her

CIVIL 03-1189 (PG)                    17

work assignments to be completed within 15 minutes of her departure time, asked her to copy mountains of paperwork that required her to lift the copier lid for each individual page, regularly subjected her to verbal abuse, destroyed and ripped her work product in her face, and misplaced important documents in order to place blame upon her. (Id. at 74-77.)

After the plaintiff filed an inter-office sexual harassment grievance, Betancourt alleges that the amount of hostility directed towards her by Madore escalated. Betancourt has provided testimony alleging that Madore became increasingly intimidating and hostile to Betancourt, and at one point almost hit the plaintiff on the breast with a pen. Yelling and screaming became commonplace. Here, such conduct, although not sexual in nature, contributed to the "abusive work environment." See, e.g., O'Rourke v. City of Providence, 235 F.3d at 730 (finding "that incidents of nonsexual conduct--such as work sabotage, exclusion, denial of support, and humiliation--can in context contribute to a hostile work environment"). Indeed, "the First Circuit has held that Courts should avoid desegregating a hostile work environment claim, dividing conduct into instances of sexually orientated conduct … and instances of unequal treatment, then discounting the latter category of conduct," the rationale being that "such an approach not only ignores the reality that incidents of nonsexual conduct--such as work sabotage, exclusion, denial of support, and humiliation--can in context contribute to a hostile work environment, it also nullifies the harassing nature of that conduct." Zambrana

CIVIL 03-1189 (PG)                    18

Santos v. Banco Santander de P.R., 363 F. Supp. 2d 56, 64 (D.P.R. 2005) (citing O'Rourke v. City of Providence, 235 F.3d at 730). The evidence also shows that plaintiff's office area was vandalized with drawings of male genitalia shortly before an investigation into her grievance occurred.

Plaintiff has complied with Local Rule 56 by providing evidence demonstrating that the frequency of the hugs and kisses, sexually charged comments, emotional aggression, abuse and work sabotage rose to such a level that would preclude summary judgment because a reasonable person could find that such behavior was frequent, severe, physically threatening, humiliating, and unreasonably interfered with the plaintiff's work performance. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 116.

4. Sexually Objectionable Conduct

UAW also argues that no reasonable person could find Juarbe's conduct hostile or abusive. UAW relies on several cases in support of its argument. However, none of the cases are controlling or convincing. The pervasiveness of the sexually objectionable conduct in the present case contrasts sharply to the relatively isolated incidents in the cases UAW relies on. Betancourt has provided evidence to the court that the alleged sexual harassment were not isolated incidences, were frequent, physically threatening, and lasted for several months.

"[W]hether the environment is objectively hostile or abusive must be answered by reference to all the circumstances, including the frequency of the

CIVIL 03-1189 (PG)                    19

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance…." Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F. Supp. 2d at 111 (citing Marrero v. Goya de P.R., Inc., 304 F.3d at 18-19). Thus, by looking at the totality of the circumstances, the evidence provided by the plaintiff could lead a reasonable person to conclude that the sexually objectionable conduct was offensive. Additionally, per Local Rule 56, plaintiff's statement of uncontested facts has provided sufficient evidence to controvert UAW's statement of facts because such evidence has raised genuine issues of material fact with regard to this prong.

        5. Employer Liability

        Employer liability is determined by the status of the harasser and the resulting injury caused by such harassment. Burlington Ind., Inc. v. Ellerth, 524 U.S. 742, 759 (1998). If the harasser is a coworker, then employer liability exists if the employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." White v. N. H. Dep't of Corr., 221 F.3d 254, 261 (1st Cir. 2000) (quoting Blankenship v. Parke Care Ctr., Inc., 123 F.3d 868, 872 (6th Cir. 1997)). If the harasser is a supervisor, the employer may "defend to harassment claims provided no tangible employment action has been taken." Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F. Supp. 2d at 112. However, "no affirmative defense is available … when the supervisor's harassment culminates in a tangible employment action, such as discharge,

CIVIL 03-1189 (PG)                         20

demotion, or undesirable reassignment." <u>Id.</u> (quoting <u>Burlington Indus., Inc. v.</u> <u>Ellerth</u>, 524 U.S. at 765).

The First Circuit has held that the question of "whether an employee is a supervisor in the relevant sense is itself factual in nature." <u>Noviello v. City of</u> <u>Boston</u>, 398 F.3d at 95 (citing <u>Hrobowski v. Worthington Steel Co.</u>, 358 F.3d 473, 478 (7th Cir. 2004)). "The key to determining supervisory status is the degree of authority possessed by the putative sponsor." <u>Noviello v. City of Boston</u>, 398 F.3d at 95 (citing <u>Joens v. John Morrell & Co.</u>, 354 F.3d 938, 940 (8th Cir. 2004); <u>Parkins v. Civil Constructors of Ill., Inc.</u>, 163 F.3d 1027, 1033 (7th Cir. 1998)). Additionally, the First Circuit adopts the Seventh Circuit's view that "supervisory status" depends on the ability to affect the terms and conditions of the victim's employment, such as the ability to "hire, fire, demote, promote, transfer, or discipline an employee." <u>Noviello v. City Boston</u>, 398 F.3d at 96 (quoting on <u>Parkins</u> <u>v. Civil Constructors of Ill., Inc.</u>, 163 F.3d at 1034). In <u>Parkins</u>, the court went on to state that "because liability is predicated on misuse of supervisory authority, the touchstone for determining supervisory status is the extent of authority possessed by the purported supervisor." <u>Parkins v. Civil Constructors of Ill., Inc.</u>, 163 F.3d at 1033.

For example, in <u>Messina v. Araserve, Inc.</u>, the alleged harasser was responsible for all production of food and oversaw the general cooks, one of whom was the plaintiff. <u>Messina v. Araserve, Inc.</u>, 906 F. Supp. 34, 37 (D. Mass. 1995).

CIVIL 03-1189 (PG)                              21

There, the court held that supervisory authority was a question for the trier of fact because the alleged harasser, although not a "direct supervisor," had some authority over the plaintiff because he was the executive chef. Id.

UAW claims Juarbe did not have any supervisory status because it was Robert Madore, Assistant Director Region 9A of the UAW, who handled the majority of the supervisory duties in the Carolina office. However, in compliance with Local Rule 56, plaintiff Betancourt has provided documentary evidence to the contrary. Orta, a UAW representative who worked daily in the Carolina office, testified that the UAW representatives at the Carolina office were "the clericals' direct supervisors." (Docket No. 88, Ex. 8, ¶ 8.) She also testified that Juarbe was not a coworker of Betancourt, rather a supervisor because Ortiz and Juarbe were the only two managers at the Carolina office with decision making power. Additionally, Ortiz and Juarbe were the only ones with the "most power to substantially influence Madore and Wheeler on the terms and conditions of the secretaries' employment," and Juarbe was the "singular source of information [Madore and Wheeler] had about the office affairs in Puerto Rico," given that Juarbe was the only manager fluent in English. This testimony is especially important given that Madore oversaw other offices in the United States and was only present at the Carolina office 85 days out of the year. Phil Wheeler spent less time in the Puerto Rico office. (Docket No. 64, Madore's Dep. at 62, ll.4-5; Wheeler Declaration, ¶ 9.) Indeed, this was the case in Faragher, where the Court found the alleged harassers to have "supervisory status"

CIVIL 03-1189 (PG)                                22

because both had "'virtually unchecked authority" over subordinates, "directly controll[ed] and supervis[ed] all aspects of [the victim's] day-to-day activities,' and victim and colleagues were 'completely isolated from the [employer's] higher management.'" Mikels v. City of Durham, 183 F.3d 323, 333 (4th Cir. 1999) (quoting Faragher v. City of Boca Raton, 524 U.S. at 808). Additionally, Juarbe was present when Betancourt interviewed to work for the Carolina office. (Docket No. 64, Betancourt's Dep. at 15, ll. 7-8.)

Per Local Rule 56, plaintiff Betancourt has provided documentary evidence showing that Juarbe and Ortiz had supervisory authority over her and the other clericals. Ortiz testified that "[a]t no time was [she] told by Wheeler or Madore that they were responsible for the supervision of the clerical workers in Puerto Rico. To the contrary, on several occasions I was told by both Madore and Wheeler, that I was responsible for anything that was related to the clericals." (Docket No. 88, Ex. 9, ¶ 4.) Heywood, a clerical, also testified that Ortiz was the person responsible for making decisions concerning our vacation time, absences, or tardiness. (Docket No. 88, Ex. 10, ¶ 4.) Even more, she testified that Juarbe's fluency in English gradually led him to take over Ortiz' position.  Indeed, Juarbe would get visibly upset whenever the other UAW representatives at the Carolina office contacted Madore, Wheeler, or attempted to give instructions to the plaintiff. (Docket No. 88, Ex. 8, ¶¶ 18, 19.) Juarbe oversaw the plaintiff's workload given that she was employed as a clerical to serve and further the interests of the UAW representatives, who were in

CIVIL 03-1189 (PG)                              23

charge of organizing drives.  Juarbe testified that not only did he have the ability to instruct the clericals, but he had the opportunity to inform Madore if Betancourt did not properly do her job.  Thus, Betancourt's compliance with Local Rule 56 raises genuine issues of material fact sufficient to preclude summary judgment with regard to employer liability.

In a light most favorable to the plaintiff, Betancourt's statement of uncontested facts suggests that Juarbe had "supervisory status," such that a reasonable person could conclude employer liability exists.  In compliance with Local Rule 56, Betancourt has provided testimonial evidence suggesting that Juarbe had significant power and control over the clericals in the Carolina office.  Indeed, the "Supreme Court has made clear that heightened liability exists in this context only because a supervisor's conduct is made possible by the 'abuse of his supervisory authority,' his apparent authority, or because his supervisory position aided him accomplishing the harassment." Parkins v. Civil Constructors of Ill., Inc., 163 F.3d at 1033 (quoting Faragher v. City of Boca Raton, 524 U.S. at 802).  Moreover, UAW's reliance on the "Faragher and Ellerth" affirmative defense[4] is inapplicable, given

---

[4]The "Faragher/Ellerth" affirmative defense may be raised by an employer in cases where a plaintiff is attempting to impose vicarious liability for the hostile work environment created by a supervisor with higher or immediate authority over the complaining employee. Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 32 (1st Cir.), reh'g & reh'g en banc denied by 337 F.3d 1 (2003) (citing Faragher v. City of Boca de Raton, 524 U.S. at 807-08; Burlington Indus., Inc. v. Ellerth, 524 U.S. at 764-65). "The defense is comprised of two necessary elements:  (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage

CIVIL 03-1189 (PG)                    24

that Betancourt was discharged from her employment three months after filing her internal complaint.  See Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F. Supp. 2d at 112.  Thus, genuine issues of material fact exist that preclude summary judgment.

B.  Title VII Claim:  Retaliation

Title VII, specifically 42 U.S.C. 2000e-3(a), provides in relevant part:

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified , assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. 2000e-3(a).  "To prove a claim of retaliation, [one has to] establish that (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) [that] there [is] a causal connection between the protected conduct and the adverse employment action."  Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004) (citing Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002)).  The prima facie case of retaliation has been described as a "small showing" that is "not onerous" and is "easily made."  Kosereis v. Rhode Island, 331 F.3d at 213 (citations omitted).  There are many sources of circumstantial evidence that can demonstrate retaliation so as to clear the summary judgment hurdle.

---

of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Faragher v. City of Boca de Raton, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765.

CIVIL 03-1189 (PG)                    25

Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991).  One way is to show a close temporal proximity between the protected conduct and the adverse employment action. Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994). Another way is to demonstrate a "discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action...." Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003) (citing Kachmar v. Sunguard Data Sys. Inc., 109 F.3d 173, 177 (3rd Cir. 1997)).  Once a prima facie case of retaliation is established, a presumption of retaliation arises and the McDonnell-Douglas burden shifting approach is employed--whereby the defendant has the burden (of production) to articulate a legitimate non-discriminatory reason for the employment decision. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the employer succeeds at this task, then the burden shifts back to the plaintiff to show pretext and retaliatory animus.   Calero-Cerezo v. United States Dep't of Justice, 355 F.3d at 26.

   1. Prima Facie Case

       Betancourt claims that she was retaliated against because of the internal sexual harassment complaint she filed.  UAW does not dispute that Betancourt engaged in protected conduct and experienced an adverse employment action. UAW does, however, argue that Betancourt's prima facie case fails because there is no causal relationship between her complaints of sexual harassment and her lay-off. UAW is correct in stating that a three-month period of time has been held

CIVIL 03-1189 (PG)                            26

insufficient to establish a causal connection based on temporal proximity.  See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d at 25 (holding that in order to establish a causality, the temporal proximity must be very close and three and four month periods have been held insufficient to establish such causality).  However, only two months elapsed between Madore's receipt of Betancourt's grievance (September 10, 2001) and Betancourt's subsequent discharge in November of that same year.  Temporal proximity is not the sole means of proving retaliation, and "evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection."  Che v. Mass. Bay Transp. Auth., 342 F.3d at 38; see also Mesnick v. Gen. Elec. Co., 950 F.2d at 828 (holding that "there are many sources of circumstantial evidence that…can demonstrate retaliation"); Kachmar v. Sunguard Data Sys. Inc., 109 F.3d at 177 (holding that "where there is a lack of temporal proximity, circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" that causality exists).  In Che, the court found that the plaintiff had made a showing of causality despite a lack of temporal proximity because the plaintiff had provided evidence that after filing his internal complaint, the defendant's refused to discipline anyone else other than the plaintiff for writing on an assignment block.  Che v. Mass. Bay Transp. Auth., 342 F.3d at 38.

CIVIL 03-1189 (PG)                    27

Per Local Rule 56, Betancourt's statement of uncontested facts demonstrates that upon filing her internal complaint, discriminatory and disparate treatment from Madore ensued.  Specifically, Betancourt testified that Madore's behavior turned from "white to black," he spoke to her rudely, and became increasingly hostile and intimidating to the point of almost hitting her with a pen on her breast." (Docket No. 88, Plaintiffs' Opposing Statement of Material Facts at 21, ¶ 81.) Betancourt's office was also vandalized with drawings of male genitalia.  (Docket No. 64, Juarbe's Dep. at 51, ll. 14-25; at 52, ll. 1-2.)  And when the investigatory process commenced, despite Betancourt's lack of English fluency, she was denied a translator.  (Docket No. 88, Plaintiffs' Opposing Statements of Material Facts at 29, ¶ 116; Ex.18.)  Additionally, Garvin, who was in charge of investigating Betancourt's grievance,  testified that he formed his finding after he spoke with all the clericals during the investigation.  He went on to testify that the comment "if you are going to misbehave, invite me" was widely used within the office as a joke.  (Id. ¶ 119a.) Yet, Heywood, Gonzales, Ortiz, and Cartagena all testified that Madore never asked any of them such inquiries.  (Id. ¶ 121.)  In a light most favorable to the plaintiff, this demonstrates disparate treatment towards Betancourt.  Plaintiff's evidence of discriminatory treatment is sufficient to meet "the relatively low threshold showing necessary to establish a prima facie case...."  Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 165-66 (1st Cir. 1998).

CIVIL 03-1189 (PG)                    28

2.  Legitimate, Non-discriminatory Reasons

UAW argues that if the court finds that Betancourt successfully established a prima facie case of retaliation, that it has nevertheless met its burden of showing a legitimate non-discriminatory reason for Betancourt's termination.  Specifically, UAW argues that because Betancourt was hired solely to provide clerical support for specific organizing campaigns in which the UAW was involved (Docket No. 64, Madore's Declaration, ¶ 7), her termination was legitimate given that between January and November 2001, 21 temporary organizers were terminated by the UAW.  In essence, UAW argues that lack of work led to her termination.  Juarbe, Komer, and Wheeler also testified that plaintiff's position has not been replaced. (Id. Juarbe's Dep. 58; Wheeler's Declaration at ¶ 8.)  Additionally, UAW points out that Betancourt had the least amount of seniority among all of the clericals in the Carolina office.  (Id. Madore Ex. 1; Madore's Dep. at 111-119.)

The defendant's burden has been satisfied given that the burden itself at this stage is not onerous.  UAW has proffered legitimate, non-discriminatory reasons for Betancourt's discharge.  I consider whether Betancourt can establish that the proffered reasons are pretext for discrimination.

3. Pretext

In the context of the McDonnell-Douglas burden shifting framework, once an employer satisfies its burden of showing a legitimate non-discriminatory reason for the adverse employment action, the burden of production shifts back to the plaintiff

CIVIL 03-1189 (PG)                    29

who is then given an "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Tex. Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  In other words, "[t]he plaintiff must then introduce sufficient evidence to support two additional findings: (1) that the employer's articulated reason for the job action is a pretext, and (2) that the true reason is discriminatory." Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 1994) (citing Woods v. Friction Materials, Inc., 30 F.3d 255, 260 (1st Cir. 1994), abrogated by Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133 (2000)).  Additionally, although a plaintiff's prima facie burden is not onerous and easily met, Kosereis v. Rhode Island, 331 F.3d at 213, a more demanding showing is required in any pretext analysis. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 255 (explaining that when the defendant carries its burden of showing a legitimate non-discriminatory reason, the presumption raised by the prima facie case is rebutted and the factual inquiry proceeds to a new level of specificity).

    Betancourt argues that only seven organizers were terminated in November, and of those seven, only six were hired three months prior to their termination. With regard to the 21 organizers terminated between January and November 2001, only three were employed by the UAW before January 2001.  And of the remaining 18 organizers which were hired between the months of April and October 2001, 15

CIVIL 03-1189 (PG)                    30

of these organizers were employed by the UAW for a period of only two months or less.  This contrasts sharply with the 16 organizers present when Betancourt was hired, of which 10 remained when she was fired.  (Docket No. 88, Ex. 7.)

Additionally, Betancourt directly controverts in her statement of uncontested facts that her job was not contingent upon the success of the organizing drives or the work of the temporary organizers.  Orta testified that "Marta's responsibilities were not significantly related to the organizers.  Miriam Martínez was a clerk typist whose responsibilities were closely related to the organizers." (Docket No. 88, Ex. 8, ¶¶ 22, 23.)  She also testified that Marta was responsible for performing general clerical and administrative work that included receptionist related tasks, writing, receiving, and forwarding mail and faxes, as well as providing Orta with developing the curriculum for the educational workshops.  Ortiz, Heywood, and Martínez have all corroborated that Betancourt's responsibilities had little to do with the organizers.  (Docket No. 88, Ex. 9, ¶¶ 15-18; Ex. 10, ¶¶ 8-11; Ex. 12, ¶¶ 12-14.) Moreover, Heywood testified that when Betancourt was discharged, Heywood began to assume all of Betancourt's responsibilities.  Cartagena also testified that "at the time [Betancourt] was fired, there was a lot of work that needed to be done by clerical workers.  Cartagena also testified that when Betancourt was discharged, there was no one to answer the telephones, and Cartagena had to sacrifice her own work in order to assume the responsibilities left by Betancourt.

CIVIL 03-1189 (PG)                    31

If Betancourt's responsibilities really were contingent upon the temporary organizers, she would have been terminated far earlier, because by November 17 temporary organizers were already terminated. Even more, Ortiz testified that "after [Betancourt] was fired, many organizers returned to work at the UAW and some people were hired to do secretarial work...." (Docket No. 88, Ex. 9, ¶ 18.) Betancourt was never rehired. Even more important is that fact that Betancourt's duties were irrespective of the amount of organizers employed by the Carolina office. Heywood testified that "[clericals] always have tasks that are associated with the Presidents of the Locals. The clericals' main job is to assist the local unions and assist the International Representatives. We have 15 locals already organized and that means that every clerical, [Betancourt] included, is necessary to get the job accomplished.... [E]ven though there are no ongoing organizing drives, the clericals are extremely busy attending to the needs of the documents to be typed, modified ... and forwarded to the International Representative." (Docket No. 88, Ex. 10, ¶ 10.) Such evidence creates an issue of fact as to whether plaintiff's termination was a pretext for discrimination and retaliation.

Given that Betancourt has complied with Local Rule 56 and has referenced sufficient evidence in her statement of uncontested facts that precludes summary judgment, she has created an issue of fact as to whether UAW's reasons for her discharge were mere pretext and was the result of retaliatory animus.

CIVIL 03-1189 (PG)                    32

C.  State Law Claims

Having concluded that all of the causes of action based on federal law should not be dismissed, I also recommend that UAW's motion for summary judgment be denied with regard to all causes of action based on Puerto Rico law.  See United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966); Sánchez v. Autoridad de Energía Eléctrica, 360 F. Supp. 2d 302, 318 (D.P.R. 2005); Confederación Laborista de P.R. v. Cervecería India, Inc., 607 F. Supp. 1077, 1081 (D.P.R. 1985).

IV.  CONCLUSION

In view of the above, it is my recommendation that UAW's motion for summary judgment be DENIED.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation.  The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.  Failure to comply with this rule precludes further appellate review.  See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v.

CIVIL 03-1189 (PG)                    33


<u>Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>,

616 F.2d 603 (1st Cir. 1980).

     In San Juan, Puerto Rico, this 10th day of October, 2005.


                                 S/ JUSTO ARENAS
                   Chief United States Magistrate Judge